BARFIELD, Chief Judge.
Appellant challenges a declaratory statement of the Department of Insurance (DOI), pursuant to section 120.565, Florida Statutes (1995), which determined that the sale of its home health care plan (the Plan) would be the sale of “insurance” as defined in section 624.02 and “health insurance” as defined in section 627.603. We reverse.
For an annual fee of $1875.00, the Plan provides a guaranteed “membership,” renewable for life without any age or pre-existing condition requirements, which entitles the member to purchase home health care from a specific provider, Maxim Healthcare Service, Inc., at discounted rates whenever the member so chooses, without prior hospitalization, convalescent care, doctor’s orders, or third party ease management. The home health care services are provided for eight or twenty-four hours per day at two levels: Level I (homemaker/companion) care includes cooking, shopping, assistance with the telephone, laundry, housekeeping, and driving (either the member’s vehicle or the caregiver’s vehicle); Level II (home health aide) care includes the above-mentioned services plus feeding, bathing, dressing, toileting, and transferring. The daily charges for these services to members in the Orlando and Sarasota areas are $85 and $95, respectively, plus a $150 assessment fee for Level II care. In the other areas (Jacksonville, Tampa, St. Petersburg, Lakeland, West Palm Beach, Ft. Lauderdale, and Miami), the charges are $71 and $81, respectively, plus a $150 assessment fee for Level II care. The Plan states: “Member must pay directly to Maxim Healthcare Services, Inc. whatever charges are incurred over and above Liberty Care Plan discount at the end of each seven (7) day period” (this is referred to in the contract as a “co-payment”). These charges for home health services are not deductible from the annual fee. Increases in the charges are guaranteed not to exceed the cost of living or 4% annually, whichever is less, as long as the membership remains current. The contract documents state in bold letters: “THIS IS NOT INSURANCE.”
The parties stipulate that there was no formal hearing and that the record consists of appellant’s handwritten request for a declaratory statement, a copy of the Plan, the declaratory statement, and the notice of appeal.[1] In its declaratory statement, DOI found that section 624.02, Florida Statutes (1995), defines “insurance” as “a contract whereby one undertakes to indemnify another or pay or allow a specified amount or a determinable benefit upon determinable contingencies” and that section 624.603, Florida Statutes (1995), defines “health insurance” as “insurance of human beings against bodily injury, disablement, or death by accident or accidental means, or the expense thereof, or against disablement or expense resulting from sickness, and every insurance appertaining thereto.” Its analysis also relied upon Boyle v. Orkin Exterminating Co., 578 So.2d 786 (Fla. 4th DCA 1991) (“whether or not a contract is one of insurance depends on its purpose, effect, contents and import, and is not determined merely by the terminology used”), and Professional Lens Plan, Inc. v. Department of Insurance, 387 So.2d 548 (Fla. 1st DCA 1980).
In the latter ease, this court held that the appellant, which acted as a sort of referral service for a plan whereby optometrists *204 would furnish replacement contact lenses to their patients for an annual fee plus a fixed dispensing fee (about 50% of the retail cost of the lenses), was not engaged in the business of insurance because there was “no contractual obligation or duty” between the appellant and the patient. In dicta, the court observed that the contract between the optometrists and their patients was not “insurance,” based on an analysis of the five elements “normally present in an insurance contract”: 1) an insurable interest; 2) a risk of loss; 3) an assumption of the risk by the insurer; 4) a general scheme to distribute the loss among the larger group of persons bearing similar risks; and 5) the payment of a premium for the assumption of the risk. Noting that under the plan, the patient must still pay for the actual cost of the contact lenses, the court found that only the first two of these five elements were present in the optometrist/patient contract:
[A] patient may obviously have an “insurable interest” in his contact lenses. Admittedly there is a “risk of loss” of his lenses. It must also be recognized, however, that the contract provides terms upon which lenses may be purchased entirely apart from any question of “insurable interest,” or loss or damage to the patient’s existing lenses. Even if it is conceded, as the Department argues, that the “primary object” of the agreement is to provide for replacement of lost or damaged lenses, we cannot agree that the PLP is thereby transformed into a contract of insurance. The contractual arrangement is lacking in the other elements, viz, assumption of risk by the insurer, distribution of a loss, and payment of a premium for assumption of a risk-the “contract ... to indemnify” aspect of the statute (Section 624.02).
... [T]he contract between the optometrist and his patient is not one of indemnity, but rather, it is one providing for the purchase of additional or replacement contact lenses by a patient. Neither Professional nor the optometrist suffers any “loss” by virtue of a patient’s exercise of his option, under the contract, to purchase as many additional sets of lenses as he desires.... There is no “distribution of loss” under this arrangement, nor is there payment of a “premium,” since no part of the annual fee paid by the patient is utilized in paying the cost of the replacement lenses. The annual fee paid by each patient resembles more closely a consideration paid for an option to purchase lenses at a fixed price ...
387 So.2d at 550-51.
In its declaratory statement, DOI found that several aspects of the Plan “make it apparent that the contract was developed for and intended to furnish services in the event of sickness or disability.” It noted that appellant had furnished documentation which indicated that the average daily retail charges for Level I and Level II care in Florida are $150 and $175, respectively, and concluded that appellant “is insuring 50% of the price of the services by means of the contract.” It found that the large annual membership fee “can only be justified if it is viewed as a guarantee that the services will be available at a reduced price (50% of retail) in the event of sickness or disability” and that “this guarantee of a reduced retail price for the services makes the Liberty Plan a contract of insurance.” It found that the member’s portion of the retail price, “regardless of to whom paid, is the equivalent of a deductible,” the functional purpose of which “is simply to indicate the point at which the insurance company’s obligation to pay ripens.” It found that the portion of the retail price absorbed by appellant “is in actuality that portion of the retail cost they are insuring.” It cited Professional Lens Plan as “[t]he leading case in Florida in determining whether a membership arrangement is insurance,” and noted:
The court in that easq used the five elements set forth in Guaranteed Warranty Corp., Inc. v. State ex rel. Humphrey, 23 Ariz.App. 327, 533 P.2d 87 (1975), as the test for determining whether a contract is insurance. The Liberty Care Plan meets all five elements:
1. An insurable interest — the member’s health.
2. A risk of loss — The member’s health will deteriorate to the point home health care is needed, particularly Level II.
*205 3. An assumption of the risk by the insurer. Liberty Care Plan has agreed to pay 50% of the retail price of the home health care or furnish the service at a charge which is 50% of retail price. This is co-insurance. Liberty Care is assuming part of the risk of this coverage.
4. A general scheme to distribute the loss among a larger group of persons bearing similar risks.
5. A payment of a premium for the assumption of risk. The annual fee for membership is nothing more than a premium for insurance coverage.
It concluded that the Liberty Care Plan met the statutory definitions of “insurance” and “health insurance,” as well as “the five elements of an insurance contract as set forth in Professional Lens Plan,” and that the Plan therefore “can only be sold in Florida by a company properly licensed under Chapter 624, Florida Statutes, and by agents properly licensed in accordance with Chapter 626, Florida Statutes.”
ARGUMENTS
Appellant asserts that the Plan’s overall purpose is not to indemnify its members against loss, but to provide low cost home health care services to its members, citing Boyle and Transportation Guarantee Co. v. Jellins, 29 Cal.2d 242, 174 P.2d 625 (1946), cited therein. It argues that the Plan does not meet the statutory definition of “insurance” because the services it provides do not become available upon the “determinable contingencies” of sickness or disability, but are available to members upon request. It contends that DOI has misunderstood and misapplied Professional Lens Plan, which it asserts is factually very similar to this case. It asserts that DOI’s “misguided decision” in this case, if upheld, will deprive the elderly and needy of low cost home health services.
DOI argues that the Plan meets the statutory definitions of “insurance” and “health insurance,” that the “determinable contingency” in the Plan is the deterioration of the member’s health to the point that expensive home health services are needed, and that many of the services provided by Level II care are so personal that a third party determination of need is not necessary. It argues that the facts of this ease are not similar to those in Professional Lens Plan, in which the appellant merely acted as a “referral service” on behalf of the providers and had no contract with the members, but asserts that the opinion in that case is nevertheless valuable in analyzing whether the Plan is insurance, using the five element test, and contends that the Plan is clearly insurance because it meets all five elements. As to appellant’s argument that regulating such plans will deprive the elderly and needy of low cost home health services, DOI argues that regulation is necessary to protect the elderly in this type of marketing, to make certain that providers have sufficient capital and surplus to stay in business, that reserves are established for early cancellations, that a standardized contract is used to avoid hidden limitations, that annual membership fee (premium) rates are reasonable, and that agents selling memberships are properly trained and licensed.
Appellant replies that the Plan is “factually analogous” to the plan held not to be insurance in Professional Lens Plan, that the Plan does not contain all five elements of insurance set out in that case, and that DOFs assumptions (that only persons who are sick or have a disability will request home health care services, because these services are so “personal” and so “expensive and continuous”) are not based on any substantive evidence and “lead to its misguided interpretation of the facts.”
ANALYSIS
We find that the Plan meets the general definition of “insurance” set out in the Florida Insurance Code, section 624.02, Florida Statutes (1995): “a contract whereby one undertakes to indemnify another or pay or allow a specified amount or a determinable benefit upon determinable contingencies.” The Plan is a contract whereby appellant undertakes to allow a determinable benefit (i.e., home health care services at discount rates) upon a determinable contingency (i.e., the member’s exercise of the option to pur *206 chase these home health care services at discount rates).
Section 624.13 states: “Provisions of this code relative to a particular kind of insurance or a particular type of insurer or to a particular matter shall prevail over provisions relating to insurance in general or insurers in general or to such matter in general.” We find that the general definition of “insurance” set out in section 624.02 is limited by certain provisions of Part V of the Florida Insurance Code. Section 624.6011, which classifies “insurance” into seven specific “kinds of insurance”: life, health, property, casualty, surety, marine, and title. Each of these “kinds of insurance,” including a “miscellaneous” category under “casualty insurance,” is defined in terms of traditional concepts of insurance as indemnity for risk of loss. See §§ 624.602-624.608.
We find that the Plan does not meet the definition of “health insurance” set out in section 624.603, because it is not a contract whereby appellant undertakes “to indemnify another or pay or allow a specified amount or a determinable benefit” upon the determinable contingencies of “bodily injury, disablement, or death by accident or accidental means” or “disablement ... resulting from sickness.” While it is clear that the Plan targets those who are disabled from sickness or injury, the agreement contains no requirement that any beneficiary of the Plan must be sick, disabled, or injured. Any member of the Plan may order any of the home health care services as long as the member is willing to pay the discounted rates. For purposes of determining whether DOI is authorized to regulate the sale of the Plan as the sale of “insurance,” the fact that no healthy and non-disabled participant would require or use the home health care services it provides is irrelevant.
Whether the sale of the Plan and similar contracts should be regulated by DOI is a policy question which must be directed to the Florida Legislature. Such regulation would appear to be authorized by the general definition of “insurance” in section 624.02 of the Florida Insurance Code, if the legislature were to amend the above-cited provisions in Part V of the Code to expand the application of that general definition of “insurance” beyond the traditional concept of indemnity against risk of loss.
One commentator has observed that three tests may be used in resolving the question of defining “insurance.” Eric Mills Holmes, Holmes’s Appleman on Insurance § 1.4 (2d ed.1996). The first test, which conforms to the traditional “indemnity” concept of insurance as an arrangement for transferring and distributing the risk of loss upon the happening of a fortuitous event, is called the “substantial control” test. Holmes notes:
The test derives from Professor William R. Vance’s 1904 description of an insurance contract (made between parties customarily called the insurer and the insured) as having the following five elements:
(a) The insured possesses an interest of some kind susceptible to pecuniary estimation, and known as an insurable interest;
(b) The insured is subject to a risk of loss through the destruction or impairment of the insurable interest by the happening of certain designated fortuitous perils [today generally called the insured event];
(c) The insurer assumes that risk of loss [which today we describe as risk transference];
(d) The insurer assumes that risk as part of a general scheme to distribute actual losses among a large group bearing somewhat similar risks; and,
(e) As consideration for the insurer’s promise to assume the risk of loss, the insured makes a contribution (called a premium) to the general insurance fund [(d) and (e) constitute risk distribution].
Whatever the form it takes or the name it bears, any contract having those five elements is a contract of insurance in the traditional sense .... within this classical definition of insurance, the most important element was the insured fortuitous event, *207 that is, an event that is substantially beyond the control of the insured.
Id. at 22-29 (emphasis in the original).
Holmes identifies the second test which may be used in resolving the question of defining “insurance” as the “principal object and purpose” test, explaining:
Rather than exclusively adopting the control test in determining whether a commercial transaction is one of insurance, some courts now ask: Were the elements of risk transference and distribution of a fortuitous insured event a central and relatively significant feature of the commercial transaction or simply incidental and ancillary to the other elements that give the transaction its distinctive nature?
Id. at 31 (emphasis in the original). Under this test, some courts have asked whether “service” or “indemnity” was the “principal object and purpose” of the arrangement. Id. at 31-37.
Holmes suggests that these two tests “should not be the end of the inquiry in determining if a particular commercial transaction constitutes insurance,” but that courts “should examine each commercial transaction to determine if the discrete transaction ought to be regulated in the public interest as the business of insurance.” Id. at 37-38. He calls this third test the “regulatory value” test and suggests that enterprises which might meet the test include auto clubs, vehicle protection plans, collision damage waivers, homeowner’s warranty plans, prepaid service plans, “and similar contractual provisions that have a ‘public interest’ insurance element.” Id. at 38. He notes the fact that the promise in the “warranty agreement” in Guaranteed Warranty Corp., Inc. v. State ex rel. Humphrey was made by a third party, not the manufacturer or seller, and observes that this fact “was critical to the court’s opinion” in that ease. He suggests: “Protection of the public from the schemes, deceptions and insolvencies of third parties who make insurance-type promises is another solid reason to justify the application of state insurance regulatory laws.” Id. at 38-39.
The declaratory statement is REVERSED.
DAVIS, J., concurs.
BENTON, J., concurs in part and dissents in part, with opinion.

. In its notice of appeal, appellant seeks an evi-dentiary hearing pursuant to section 120.68(6), Florida Statutes (1995), and supersedeas pursuant to section 120.68(3)(a), asserting that the declaratory statement terminated its authority to transact business. The Department of Insurance (DOI) responds that appellant never requested a hearing prior to disposition of its request for declaratory statement, and that none was required under section 120.565 or Florida Administrative Code Rule 4-121.043(2). As to superse-deas, DOI responds that section 120.68(3)(a) does not apply because appellant has never been granted a certificate of authority or any other type of license which would authorize it to operate as an insurer in Florida.